UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
Marat Krivoi,

                Petitioner,

      -against-

Paul W. Chappius, Jr.,
Superintendent, Elmira Correctional Facility


                Respondent.
----------------------------------------------------------------X

FILED
CLERK

4:06 pm, Nov 19, 2021

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**MEMORANDUM AND ORDER**
13-CV-3533 (GRB)

**GARY R. BROWN, United States District Judge:**

      Petitioner Marat Krivoi ("Petitioner") petitions this Court for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging his conviction and sentence for two counts of Murder in the Second Degree (N. Y. Penal Law § 125.25[1]) in the Supreme Court of the State of New York, Kings County (the "trial court"). On this petition, Petitioner raises several claims, as follows:

- A *Brady* claim arising out of the State's failure to disclose exculpatory statements by his ex-wife Alesya Nayfeld's which would have impeached the state's lead witness;

- A *Bruton* claim arising out of the trial court's admission of redacted statements made by codefendant Vitaly Ivanitsky, who was tried jointly with Petitioner before a separate jury;

- A due process claim arising out of the trial court's exclusion of an FBI report of an interview with an unavailable witness; and

- The cumulative effect of these errors, allegedly depriving Petitioner of a fundamentally fair trial.

1

For avoidance of doubt, in this case the Court must grapple with an established *Bruton* violation (as found by the state appellate court) and seemingly improper conduct by the prosecution in connection with the alleged *Brady* violation.  Indeed, the main factor which permits this conviction to narrowly pass constitutional muster is the strength of the evidence, in particular, recorded admissions by Petitioner which appear, in the context of this matter, unassailable.  Ultimately, therefore, under the applicable standards, these claims do not warrant *habeas* relief because, taken singly or in combination, none emanate from a decision that was contrary to, or an unreasonable application of, clearly established federal law, so the petition is denied.  At the same time, this Court also certifies this matter for appeal to the United States Court of Appeals for the Second Circuit.

## I. FACTUAL BACKGROUND

*The Boris Roitman Murder*

On August 26, 1992, police found the body of Boris Roitman in Brooklyn near the intersection of Avenue Z and Shell Road.  Tr. at 1022-26.  According to testimony from Pyotr Sarkisov, who met Petitioner through an acquaintance in 1991 and testified as a cooperating witness at trial, Petitioner wanted to kill Roitman because he suspected Roitman was a police informant after they were nearly caught in a failed burglary designed by Roitman.  Tr. at 340-41, 366-69, 371-77.  Petitioner fashioned a plan to kill Roitman with Sarkisov and Ivanitsky by luring Roitman to a building late at night under the guise of showing him a place to burglarize.  On August 26, 1992, Revaz Gogiya, a non-cooperating witness, dropped Roitman off at a restaurant in Brighton Beach, and Gogiya saw Roitman drive away with the Petitioner.  Tr. at 181-82, 187-90, 193, 199, 230-31.  While Ivanitsky acted as a lookout, Tr. at 440, 459, Petitioner led Roitman down a pathway between the apartment building and the tennis courts, Tr. at 442-43.  Sarkisov

leapt from his hiding spot behind a bush and shot Roitman. Tr. at 442-43, 447, 913. Petitioner told Sarkisov to shoot Roitman again, which he did. Tr. at 447-48. Immediately after the shooting, eyewitness Pal Karpaty saw two individuals walking away from the scene of the crime. Tr. H. 6/13/07 at 4; Tr. H. 6/19/07 at 48-49. Later that evening, Karpaty told the police he saw one of the perpetrators holding a long shotgun. DE 4-16 at 24. However, Karpaty was unable to identify Petitioner as one of the assailants when shown a photo of Petitioner. DE 10-8 at 2. A police officer found Roitman's body later that evening, and a medical examiner determined the cause of death was multiple gunshot wounds to the chest and neck. Tr. at 1022-26, 1254-55. A ballistics expert concluded that the discharged shell found near Roitman's body came from a shotgun the FBI recovered from the wife of Artur Drubetskiy, who obtained Petitioner's weapons from Sarkisov following the murder. Tr. at 671-72, 899, 933-35, 1820-26, 1965-66.[1]

*The Thien Diep Murder*[2]

On the evening of September 22, 1992, Petitioner played pool with Thien Diep at a billiards hall on Coney Island Avenue. Tr. at 496-98. Diep, one of the pool hall's best players, owned an expensive pool cue he carried in a hard leather case. Tr. at 496-98, 501, 2166-70. Petitioner, armed with a .380 Colt pistol, told cohorts that he wanted to rob Diep because Diep was a pimp who had lots of cash. Tr. at 498-99, 509, 837-38. As Diep walked toward his car after leaving the pool hall, Petitioner ran up to him, put a gun to his head, and told him to hand over the keys. Tr. at 508-09. Vitaly Ivanitsky, a codefendant with whom Petitioner played pool, Tr. at 265, 268-71,

---

[1] The ballistics expert came to this conclusion by analyzing the marks made by the breech face of the shotgun on the brass head stamp of the shotgun shell. Tr. at 1822-27, 1965-66. Although this ballistics analysis was not conclusive, courts in this Circuit have permitted ballistics examiners to testify that a firearms match is "more likely than not." *See United States v. Glynn*, 578 F. Supp. 2d 567, 574-75 (S.D.N.Y. 2008).

[2] Most of the narrative about the Thien Diep murder is derived from the trial testimony of Sarkisov. However, this testimony is corroborated in several important respects, including admissions made by Petitioner, ballistics analysis, recordings in prison, and testimony from Natan Gozman.

3

307, took the driver's seat while Sarkisov took the passenger seat, and Petitioner forced Diep into the rear, Tr. at 509-10. The four men drove off, with Petitioner telling Ivanitsky to drive towards Diep's home. Tr. at 513-14. After Diep told Petitioner his whole family was home, Petitioner tried to find out if Diep kept money elsewhere. Tr. at 517. When Diep threatened Petitioner by telling him that his uncle belonged to a gang in Chinatown, Petitioner shot Diep twice in the back of the car. Tr. at 518-20, 523-24. To destroy the evidence, the men burned the car with Diep's body in an isolated park. Tr. at 525-28, 537, 548, 555-56.

Before burning the car, Petitioner took the leather case containing Diep's pool cue from the back seat. Tr. at 544-45, 549. Firefighters put out the fire that morning and, chillingly, a neighborhood boy found Diep's charred remains inside the car three days later. Tr. at 1195-96, 1209, 1131-36. The medical examiner concluded that Diep had been shot at least twice in the head before being burned, Tr. at 1260-67, and a ballistics expert concluded that the two bullet jackets recovered from Diep could have been fired by a Colt Government Model .380 Auto, Tr. at 1849-52, 1856-58. Following Diep's death, Natan Gozman, an associate of Petitioner who testified as a cooperating witness at trial, saw Petitioner at a pool hall with a pool cue and hard leather case that resembled Diep's. Tr. at 2166-72, 2498-99.

*Sarkisov and Gozman's Cooperation Agreement*

After pleading guilty to federal racketeering charges, in 2005 Sarkisov revealed the Roitman and Diep murders pursuant to a cooperation agreement. Tr. at 242-44, 600-14, 619-50. Gozman also testified pursuant to a cooperation agreement, Tr. at 2181-82, 2187-89, 2291-96, 2435, which he entered into after spending about five weeks at the Brooklyn Metropolitan Detention Center with Sarkisov, Tr. at 2428, 2804-05. Sarkisov and Gozman were close friends who had committed numerous crimes together. Tr. at 250-52, 263, 271, 275-316, 2071, 2237.

4

Gozman and Sarkisov stated at trial that they each independently decided to cooperate with the government, without knowing what each other had decided to do.  Tr. at 2427-31.

In 2006, the FBI and NYPD arrested Ivanitsky and questioned him regarding the murders of Roitman and Diep, Tr. at 1306-16, 1373-84, and the Brooklyn DA's Office indicted Petitioner and Ivanitsky with three counts of Murder in the Second Degree, Sup. Ct. Kings Cnty. Ind. No. 1634/2006.

*Petitioner's Incriminating Statements in Prison*

While in prison for crimes unrelated to the murders of Roitman and Diep, Petitioner made several incriminating statements in 1996 and 2006.  Tr. at 572-73, 2499-500, 2528-29.  Gozman testified that when he visited Petitioner in prison in 1996 Petitioner said he killed Roitman because he was an informant.  Tr. at 2102-03, 2425-26.  Petitioner also told Gozman he could borrow his weapons from Artur Drubetskiy, who had his weapons.  Tr. at 2106-07.  Petitioner told Gozman that he owned a shotgun, an AK-47, and a "dirty pistol," which Gozman understood to mean a pistol that had been used to kill someone.  Tr. at 2106-07, 2460-61.  Gozman borrowed the pistol for a meeting with gangsters, but subsequently threw it into a sewer because it was "dirty."  Tr. at 2111-12.

After Ivanitsky was arrested for the murders of Roitman and Diep, Tr. at 1300-02, 1364-69, in March 2006, David Mitnitsky told Petitioner in a recorded phone call that "the bull [Ivanitsky][3] got taken in."  Tr. at 2650.  Petitioner replied, "Oh, God" and asked, "For what?"  Tr. at 2650.  Mitnitsky replied, "For some old shit" that happened in 1992 and 1993.  Tr. at 2650.  Petitioner replied, "Oh my God oh my God."  Tr. at 2651.  Petitioner asked, "What could there be in 1992?"  Tr. at 2651.  Mitnitsky told Petitioner that Ivanitsky had been charged with "[t]wo

---

[3] "Bull" is Ivanitsky's nickname.  Tr. at 2076.

5

felony murders or something." Tr. at 2651. Defendant responded, "Oh shit . . . I'm scared shitless . . . (my ass is cracking)." Tr. at 2651.

In another call later that month, Dimitri Fritnitsky told Petitioner that that they were trying to get Ivanitsky for "some Chinese guy from the billiard hall," to which Petitioner responded, "Oh shit, why did they take him now, all of a sudden?" Tr. at 2667. Fritnitsky told Petitioner that Ivanitsky thought Sarkisov was the informant. Tr. at 2667. During another call, Fritnitsky told Petitioner that court documents stated "[s]omething happened in the pool hall . . . that that guy shot him, and then someone burned down some car somewhere on 80th Street." Tr. at 2671. Petitioner asked if the documents specified whom Ivanitsky was with, and Fritnitsky told Petitioner it said there was "some other accomplice." Tr. at 2671.

*The Tennis Bag and Alesya Nayfeld's Exculpatory Statements*

When Sarkisov visited Petitioner in prison in early 1993, Petitioner told Sarkisov he could use his guns. Tr. at 573-80, 670-71. According to Sarkisov, Petitioner owned three guns: a .380 Colt handgun/pistol, a black pump action shotgun, and an AK-47 rifle. Tr. at 341-50, 889-92, 897, 933. Petitioner's brother had purchased the shotgun, and the AK-47 was stolen from an acquaintance in March 1992. Tr. at 1082-1102, 1619-34. Sarkisov testified that he picked up a colorful tennis bag containing Petitioner's three guns from Alesya Nayfeld, whom Petitioner married in early 1993 while in prison. Tr. at 418-22, 574-79, 651-58, 662-66, 836, 881, 889-92, 933-34. When Sarkisov was later arrested for crimes unrelated to the Roitman and Diep murders, he instructed Artur Drubetskiy to remove the tennis bag with the guns from Sarkisov's house. Tr. at 587-88, 671-72, 836-37, 933-35. On July 13, 2005, an FBI agent obtained from Artur Drubetskiy's wife a tennis bag containing, among other items, a shotgun, shotgun slugs, and an AK-47. Tr. at 1292-97, 1352.

6

In two interviews in March and May 2007, Nayfeld told prosecutors she did not recognize the tennis bag the FBI seized from Artur Drubetskiy's wife in 2005. DE 13-3 at 79-80. At the commencement of the trial on July 3, 2007, Nayfeld's attorney moved to quash the subpoena to have her testify. The trial court stated on the record that Nayfeld's attorney "made a motion to quash a subpoena that had been issued to -- issued on behalf of the District Attorney's office and relating to Alyessa [sic] … that has been resolved[,]" and her attorney "respectfully withdr[e]w the motion." Tr. at 2-3.[4] Two months following Petitioner's conviction in August 2007, a private investigator located Nayfeld in New Jersey. Nayfeld said that she told the FBI she never gave a tennis bag to Sarkisov, the FBI threatened to take away her children if she did not tell the truth, and she told the prosecutors at the DA's Office that she never gave the tennis bag to Sarkisov. DE 13-3 at 109-10. In a 2013 affidavit submitted as an exhibit to Petitioner's § 440.10 motion to vacate the judgment, Nayfeld claimed she told the FBI that she "had never been in possession of any type of tennis bag like that or anything similar." DE 13-3 at 126. Her affidavit did not mention being threatened by the FBI. DE 13-3 at 126.

*Exclusion of the FBI 302 Report*

Prior to trial, defense counsel requested a hearing on the reliability of the FBI 302 report memorializing FBI Agent Eric Rivera's 2005 interview with Karpaty. The 302 report noted that Karpaty, a former member of the Hungarian Special Forces who was familiar with weapons, stated one of the individuals he saw after the shooting was holding a double-barreled shotgun. DE 13-3 at 107. Although both parties wanted to call Karpaty as a witness, he disappeared before trial. Tr. H. 6/13/07 at 3-11, 19-20, 32, 57; Tr. H. 6/18/07 at 4, 15. The court declined to hold a hearing or

---

[4] According to defense counsel, the trial court had a sidebar off the record with prosecutors and Nayfeld's attorney, and the defense was unaware of what was occurring. DE 14 at 6, n.2.

7

admit the 302 report into evidence, finding the report lacked sufficient indicia of reliability.  Tr. H. 6/19/07 at 49-62.

*The Bruton Violation*

Prior to trial, the court also held a conference to determine how Ivanitsky's statements would be redacted to comply with *Bruton*.  Petitioner and Ivanitsky were tried jointly before two juries for the murders of Roitman and Diep.  The court ruled Detective Peter McMahon could testify that Ivanitsky said he saw "his friends" burn a car.  Tr. H. 6/20/07 at 112-52, 133-34, 150-51.  In front of Petitioner's jury, Detective McMahon related what Ivanitsky told him regarding the murder of Diep during his interrogation at the Brooklyn DA's Office:

> Q. And did [Ivanitsky] mention anything about the location at that point in the conversation? Where the car burning took place?
> A. We spoke to [Ivanitsky] about where the location was, and [Ivanitsky] could not describe exactly where it was, except that [Ivanitsky] said that it was in like a secluded area. There were a lot of weeds around. It was like in the back of like a park area.
> Q. Did you ask [Ivanitsky] if he said anything to his *friends* about identifying anybody when he saw the car being burned by him?
> [Defense Counsel] Mr. Breitbart: Objection, Your Honor. This is the Bruton situation.
> The Court: The objection is overruled. Proceed.
> A. . . .[H]e told me that he went up to his *friends* after the car was set on fire and he said, you know, "What was that? What's going on?" And they said, "Never mind, it's none of your concern. Let's get out of here"

Tr. at 1378-79 (emphasis added).

At summation, the prosecution argued:

> [ADA] Blank: And there's more evidence and it comes out of Vitaly Ivanitsky's mouth. Vitaly Ivanitsky told the agents certain things about Boris Roitman. That he knew him, that he was killed by Avenue Z, that he was killed by a shotgun, with a shotgun you heard from Natan Gozman.

Tr. at 3293.

The court denied defense counsel's request for a limiting instruction that Detective McMahon's testimony could only be used as evidence against Ivanitsky.  Tr. at 1318-19, 1446-48.

8

The jury convicted defendant on August 10, 2007. Tr. at 3403-07. On January 31, 2008, defendant was sentenced to two consecutive prison terms of twenty-five years to life. Tr. H. 1/31/08 at 7.

*State Court Post-Conviction Proceedings*

Petitioner moved the trial court to set aside the verdict pursuant to C.P.L. § 330.30, alleging that the prosecution committed a *Brady* violation by failing to disclose Nayfeld's statements. On January 30, 2008, the court rejected Petitioner's claim, DE 13-3 at 112-25, and the Appellate Division affirmed Petitioner's conviction on February 22, 2011, *People v. Krivoi*, 81 A.D.3d 978 (2d Dep't 2011). The Appellate Division held (1) the trial court "erroneously admitted into evidence the redacted statements made by the codefendant" in violation of *Bruton* but found the error harmless beyond a reasonable doubt because it was "satisfied that the evidence of the defendant's guilt, without reference to the error, was overwhelming, and there is no reasonable possibility that the error might have contributed to the defendant's conviction" and (2) the Petitioner's *Brady* claim based on the alleged suppression of Nayfeld's denial of transferring the tennis bag to Sarkisov was not reviewable on direct appeal because that claim "dehors the record." *Krivoi*, 81 A.D.3d at 979. Although the Appellate Division did not specifically address Petitioner's argument that the trial court denied him the right to present a defense by excluding the 302 report, the Appellate Division summarily held that his "remaining contentions … are without merit." *Id.* at 980. Defense counsel applied to the New York Court of Appeals for leave to appeal, which the court denied on March 27, 2012. *People v. Krivoi*, 18 N.Y.3d 959 (2012) (Lippman, Ch. J.).

On October 5, 2013, the Petitioner moved this Court to stay adjudication of his *habeas corpus* petition so that he could exhaust his state remedies with respect to the *Brady* claim, DE 5, which this Court granted, DE 8. On October 7, 2013, Petitioner filed a motion to vacate judgment

9

pursuant to C.P.L. § 440.10 in Supreme Court, Kings County on the grounds of fraud upon the court and prosecutorial misconduct arising out of the prosecution's alleged suppression of Alesya Nayfeld's statements that she never gave Sarkisov the tennis bag containing the guns. DE 13-4 at 39-49. The Supreme Court held that Petitioner did not establish suppression of evidence because "[e]vidence is not suppressed where the defendant knew or should reasonably have known of, the evidence and its exculpatory nature," DE 9-2 at 6-7 (citation omitted):

> Nayfeld was defendant Krivoy's ex-wife and he knew, prior to trial, that she was a potential prosecution witness. He would also have known whether he had given the tennis bag containing his weapons to Nayfeld and whether he had ever told Sarkisov to collect them from her, as Sarkisov testified at trial.
>
> Sarkisov's trial testimony concluded on July 13, 2007 and the People rested their case on August 7, 2007, giving the defendant ample time to contact Nayfeld about her potential testimony. The defense investigator was able to contact Nayfeld immediately after trial and the defendant offers nothing to show that he was unable to contact her earlier. Therefore, defendant Krivoy knew of, or should reasonably have known of Nayfeld's potential exculpatory statements regarding the bag and its contents. If the People had turned over Nayfeld's statements to the defense, the statements would not have revealed any essential fact or evidence that Krivoy did not know prior to trial.
>
> DE 9-2 at 6-7.

The court went on to find there was no "reasonable probability" that Nayfeld's statements, even if credited, would have changed the jury's verdict:

> The challenged testimony involved an incident that took place after the two murders and was not an element of either of the charged murders, but was offered as background information to explain how the guns came to be in the possession of Drubetsky's [sic] wife. The evidence that Sarkisov obtained the bag containing defendant Krivoy's weapons from Nayfeld in 1993 was introduced to show that defendant Krivoy retained control over the weapons after he went to jail in 1992 and to show the chain of custody of those weapons between the murders in 1992 and their recovery from Drubetsky's wife in 2007. The only part of the chain of custody that was not corroborated by another witness or by the recovery of the guns is that Sarkisov obtained them from Nayfeld.
>
> Any denial by Nayfeld that she recognized or possessed the bag of weapons or that she transferred them to Sarkisov, if credited by the jury, would at best have served to impeach Sarkisov's testimony on a minor matter. There is no probability that such impeachment would have affected the outcome of the trial. Such testimony would have required the jury

10

> to make a credibility determination between defendant Krivoy's former criminal associate, and his ex-wife, who may not have wanted to admit any possible involvement in or knowledge of, the defendant's criminal activities. It would not have undermined the credibility of Sarkisov's testimony that he passed possession of the bag of weapons to Drubetsky, that Gozman disposed of the .380 pistol in 1996, or that the shotgun used in the Roitman murder was recovered in that bag from Drubetsky's wife in 2007, along with the AK-47 rifle the witnesses described. Nor would it have undermined the testimony that defendant Krivoy possessed the weapons prior to the murders in 1992 or that Sarkisov killed Roitman with the shotgun and defendant Krivoy killed Diep with the .380 pistol.
>
> It is highly unlikely that the jury's determinations of Sarkisov's credibility would have been undermined by the addition of Nayfeld's impeaching statements. Sarkisov was extensively cross-examined by both defendants at trial. The jury learned that Sarkisov was the person who shot and killed Roitman, that he actively participated in the car jacking kidnapping and robbery of Diep and in the arson used to dispose of and disguise Diep's car and body. They also learned that Sarkisov was a career criminal who had engaged in violent crimes and racketeering, including murder, robbery, extortion, money laundering and other organized crime activities. They knew of his guilty pleas and his cooperation agreement and the sentence benefit he hoped to obtain by testifying against the defendant. They also knew that he had initially lied to the FBI when he failed to disclose the Roitman and Diep murders in his first cooperation agreement and that he did not come clean about them until directly confronted by the FBI.
>
> Knowing all of this, the jury nevertheless credited Sarkisov's testimony and there is little possibility, let alone a reasonable probability, that its determination would have differed if Nayfeld had testified that she had not transferred the bag of weapons to Sarkisov.
>
> DE 9-2 at 8-9 (citations omitted).

The Appellate Division affirmed, finding "there was no reasonable possibility that such nondisclosure affected the outcome of the trial." *People v Krivoy*, 135 A.D.3d 876, 877 (2016). Petitioner applied to the New York Court of Appeals for leave to appeal, which was denied on April 18, 2016. *People v. Krivoy*, 27 N.Y.3d 1001 (2016) (Pigott, J.). On September 2, 2016, Petitioner filed his amended *habeas* petition. DE 10. This opinion follows.

## II. DISCUSSION

### A. Standard of Review

This petition is reviewed under the well-established standard of review of *habeas corpus* petitions, including the authority of this Court to review such matters, the application of the

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the exhaustion doctrine, the independent and adequate procedural bar, the cause and prejudice exception, AEDPA deference, the evaluation of claims of ineffective assistance of counsel and *Brady* violations, as more fully discussed in *Licausi v. Griffin*, 460 F. Supp. 3d 242, 255–60 (E.D.N.Y. 2020), *appeal dismissed*, No. 20-1920, 2020 WL 7488607 (2d Cir. Nov. 17, 2020). The discussion of these principles set forth in *Licausi* is incorporated herein by reference.

## B. The Instant Petition

*Brady Claim*

First, Petitioner argues that the state committed a *Brady* violation by withholding Nayfeld's exculpatory statement that she never transferred the tennis bag of weapons to Sarkisov. "There are three essential elements of a *Brady* violation: 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" *Licausi*, 460 F. Supp. 3d at 260 (quoting *Banks v. Dretke*, 540 U.S. 668, 691 (2004)). However, "[e]vidence is not considered to have been suppressed within the meaning of the *Brady* doctrine if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of that evidence." *See United States v. Rowland*, 826 F.3d 100, 113 (2d Cir. 2016) (citation omitted). "Prejudice can be shown when 'there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. In other words, favorable evidence is subject to constitutionally mandated disclosure when it could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Licausi*, 460 F. Supp. 3d at 260 (quoting *Cone v. Bell*, 556 U.S. 449, 470 (2009)).

12

The state court concluded there was no reasonable probability that the outcome of the trial would have been different had the state disclosed that Nayfeld denied ever giving Petitioner's tennis bag of guns to Sarkisov. *See Krivoy*, 135 A.D.3d at 877; DE 9-2 at 8-9. The jury had before them overwhelming evidence of the Petitioner's guilt, to wit: extensive testimony by Sarkisov, a first-hand witness to the murders of Roitman and Diep; recordings of Petitioner expressing consternation – if not panic – upon learning of an investigation into Ivanitsky regarding two murders in 1992; Gogiya's testimony that he saw Petitioner drive off with Roitman on the night of Roitman's murder; Gozman's testimony that Petitioner possessed Diep's pool cue after his murder and confessed to killing Roitman because he was believed to be an informant; and expert witness testimony connecting the ballistics evidence to the murder weapons. Given all of this evidence – combined with Petitioner's alarmingly incriminating statements upon learning of the investigation into the two 1992 murders that "I'm scared shitless," Tr. at 2651, and "Oh shit, why did they take [Diep] now, all of a sudden," Tr. at 2667 – the failure to disclose Nayfeld's *exculpatory testimony does not sufficiently undermine confidence in the verdict to warrant* habeas relief.

Moreover, the disputed transfer of the murder weapons from Nayfeld to Sarkisov may not have been essential to the government's case. The state court observed that Nayfeld's testimony would not have "undermined the testimony that defendant Krivoy possessed the weapons *prior* to the murders in 1992 …." DE 9-2 at 9 (emphasis added). Additionally, Gozman testified that Petitioner told him he could borrow the weapons from Drubetskiy, Tr. at 2106-07, from whom the FBI recovered the weapons that were linked to the murders of Roitman and Diep. Hence, the State established Petitioner's connection to the murder weapons independent of the disputed transfer from Nayfeld to Sarkisov. Although Nayfeld's testimony could have bearing on Sarkisov's

13

credibility, Nayfeld's testimony could not directly impact Gozman, whose testimony further tied Petitioner to the murder weapons. Additionally, as the state court observed, "[Nayfeld's] testimony would have required the jury to make a credibility determination between defendant Krivoy's former criminal associate,[5] and his ex-wife, who may not have wanted to admit any possible involvement in or knowledge of, the defendant's criminal activities." DE 9-2 at 8-9. For these reasons, the state court's determination that no prejudice resulted from the state's failure to disclose Nayfeld's exculpatory testimony, was neither "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" nor "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).[6]

*Bruton Claim*

---

[5] This should in no way suggest that the credibility of Sarkisov's testimony was unassailable. For example, though not raised below, elements of his testimony concerning the murder of Diep appear facially questionable. Sarkisov testified that Petitioner shot Diep twice – several minutes apart – with a .380 pistol in the back seat of an automobile travelling at highway speeds on the Belt Parkway. Given that the report of a .380 has been measured at 157 db (https://earinc.com/gunfire-noise-level-reference-chart/), far louder than a jet plane, that Sarkisov claims a cohort could and did continue to drive apparently unaffected by these shots inside the car strains credulity. More importantly, the principal corroboration for Sarkisov's testimony comes from Gozman: that the two main witnesses were close friends who spent five weeks together in custody immediately prior to entering a cooperation agreement, Tr. at 2428, 2804-05, provides far less assurance than had the circumstances been otherwise. *Compare Gutierrez v. McGinnis*, 389 F.3d 300, 309 (2d Cir. 2004) ("the cooperators' testimony established that the cooperators acted independently from one another in testifying against petitioner, as the cooperators testified to having had no contact with each other following their arrests"). Such issues heighten concerns around the claimed *Brady* violation.

[6] Despite finding that no prejudice resulted in this case, this opinion should not be construed to condone the State's failure to disclose Nayfeld's statements, which was highly inadvisable if not reckless. That failure was compounded by the trial court's determination to quash the state's subpoena to Nayfeld in an off-the-record sidebar from which the defense was purportedly excluded. Tr. at 2-3; DE 14 at 6, n.2. The state court's determination that no *Brady* violation occurred because Petitioner should have known the essential facts permitting him to take advantage of Nayfeld as a potentially impeaching witness appears consistent with Second Circuit precedent. DE 13 at 40 (citing *United States v. Rowland*, 826 F.3d 100, 113 (2d Cir. 2016)); *see also United States v. Stewart*, 513 F.2d 957, 960 (2d Cir. 1975) ("The government is not required to make a witness' statement known to a defendant who is on notice of the essential facts which would enable him to call the witness and thus take advantage of any exculpatory testimony that he might furnish."). Thus, the state court's finding that no suppression occurred because Petitioner knew or should have known the essential facts permitting him to take advantage of the exculpatory evidence was not "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d). It is, however, a close call, and the state's conduct remains troubling.

14

On appeal, the Appellate Division held that "the Supreme Court erroneously admitted into evidence the redacted statements made by the codefendant." *People v. Krivoi*, 81 A.D.3d 978, 979 (2011) (citing *Gray v. Maryland*, 523 U.S. 185 (1998); *Bruton v. United States*, 391 U.S. 123 (1968); *Crawford v. Washington*, 541 U.S. 36 (2004)). At the same time, that court found that "we are satisfied that the evidence of the defendant's guilt, without reference to the error, was overwhelming, and there is no reasonable possibility that the error might have contributed to the defendant's conviction. Thus, the error was harmless beyond a reasonable doubt." *Krivoi*, 81 A.D.3d at 979. A harmless *Bruton* error is insufficient to vacate a conviction on habeas. *See Brown v. United States*, 411 U.S. 223, 231 (1973) (holding the *Bruton* errors harmless because "[t]he testimony erroneously admitted was merely cumulative of other overwhelming and largely uncontroverted evidence properly before the jury"). A constitutional error is harmless unless it "had substantial and injurious effect or influence in determining the jury's verdict." *Fry v. Pliler*, 551 U.S. 112, 116 (2007) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993)). The Second Circuit has summarized the relevant factors in the harmlessness calculation as follows:

> In assessing "whether the erroneous admission of evidence had a substantial and injurious effect on the jury's decision, [we consider] the importance of the ... wrongly admitted [evidence], and the overall strength of the prosecution's case." *Wray v. Johnson*, 202 F.3d 515, 526 (2d Cir. 2000), citing *Brecht*, 507 U.S. at 639, 113 S.Ct. 1710. The importance of wrongly admitted evidence is determined by "the prosecutor's conduct with respect to the ... evidence," *Zappulla*, 391 F.3d at 468, whether the evidence "bore on an issue ... plainly critical to the jury's decision," and "whether [it] was material to the establishment of the critical fact, or whether it was instead corroborated and cumulative," *Wray*, 202 F.3d at 526 (internal quotation marks omitted).

*Wood v. Ercole*, 644 F.3d 83, 94 (2d Cir. 2011).

Thus, while the state court recognized that a *Bruton* violation occurred, it concluded that the state presented overwhelming evidence of Petitioner's guilt at trial and that, by comparison, the prejudicial effect of the *Bruton* violation was slight. In describing Ivanitsky's statements under

15

interrogation, Detective McMahon never mentioned Petitioner by name. Rather, Detective McMahon merely stated that Ivanitsky mentioned the presence of multiple "friends" at the arson, any one of whom could have been the offender. Although the prosecutor referenced other parts of Ivanitsky's testimony during summation, he did not mention Ivanitsky's statement that his "friends" burned the car. Compared to Sarkisov's extensive testimony inculpating Petitioner in the murders, Ivanitsky's statement appears unimportant. During deliberations, the jury did not ask any questions regarding Ivanitsky's statement to Detective McMahon. Tr. at 3371-73, 3384-3402. For these reasons, the Appellate Division reasonably concluded that Ivanitsky's reference to the presence of "friends" at the arson did not have a substantial and injurious effect or influence in determining the jury's verdict, and thus the *Bruton* violation and failure to give a limiting instruction were harmless error.[7]

*Exclusion of the 302 Report*

Petitioner argues that the 302 report containing Karpaty's statement that he saw a double-barreled shotgun at the scene of Roitman's murder should have been admitted into evidence, and this Court should hold an evidentiary hearing to have Agent Rivera testify as to what Karpaty said in the 2005 interview because the state court denied Petitioner the opportunity. DE 10-8 at 43-44. "The right to present a defense is one of the 'minimum essentials of a fair trial.'" *Rosario v. Kuhlman*, 839 F.2d 918, 924 (2d Cir. 1988) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973)). A defendant has a constitutional right to introduce secondary forms of evidence, *e.g.*, hearsay, when the evidence bears sufficient indicia of reliability and the declarant is unavailable. *See Rosario*, 839 F.2d at 924. However, the criminal defendant "must comply with established

---

[7] It remains nothing less than astonishing that after undergoing the extensive precaution of holding trial before two juries, the State elicited, and the trial court permitted over defense objection, this testimony in seeming violation of Petitioner's Confrontation Clause rights.

rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers*, 410 U.S. at 302. "For the exclusion of evidence to violate this right by denying the accused a fundamentally fair trial, the evidence must be 'material,' in the constitutional sense that it 'creates a reasonable doubt that did not otherwise exist' as evaluated 'in the context of the entire record.'" *Jimenez v. Walker*, 458 F.3d 130, 146 (2d Cir. 2006) (quoting *United States v. Agurs*, 427 U.S. 97, 112-13 (1976)). "If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial." *Agurs*, 427 U.S. at 112-13. But "if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *Id.* at 113. Under certain circumstances, the exclusion of evidence on the basis of a valid application of the hearsay rules may violate due process if the evidence is sufficiently reliable and crucial to the defense. *See, e.g.*, *Chambers*, 410 U.S. at 302 (finding that the state's common law "voucher rule" precluding the defense from impeaching their own witness violated due process).

The Appellate Division reasonably concluded that Petitioner's right to present a defense claim lacked merit. *Krivoi*, 81 A.D.3d at 980. The trial court properly excluded the 302 report from evidence as the unsworn statement did not fall under any recognized hearsay exception. The 302 report lacked sufficient indicia of reliability because the report was made 13 years after the murder, there was no evidence corroborating Karpaty's observation of a double-barreled shotgun, and he failed to mention that the shotgun was double-barreled when he was interviewed by the NYPD shortly after the crime. Moreover, the evidence of Petitioner's guilt was overwhelming. Indeed, the FBI's ballistics analysis concluded that the discharged shell found near Roitman's body came from the shotgun recovered from Drubetskiy's wife. Tr. at 1820-26, 1965-66. Karpaty's statement 13 years later that he saw a double-barreled shotgun at night as the assailants – whom

17

he could not identify – ran away, does not create a reasonable doubt as to Petitioner's guilt when taken in the context of all the evidence. Thus, under AEDPA's highly deferential standard of review, it cannot be said that the state court's decision was an unreasonable application of *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973), which concerned the application of a common law rule preventing the defense from impeaching its own witness.

Finally, Petitioner is not entitled to an evidentiary hearing to permit Agent Rivera to testify about Karpaty's statements. Because the state court decided Krivoi's claims on the merits[8] and the court's rejection of defendant's claim was not an unreasonable application of clearly established federal law, this court's review is limited to the record that was before the state court. *See Cullen v. Pinholster*, 563 U.S. 170, 184-85 (2011). Krivoi's reliance on *Lopez v. Miller* is misplaced – in that case the district court found that the petitioner had a strong chance of satisfying § 2254(d) because it appeared the state court's decision was based on an unreasonable determination of the facts. *See* 906 F. Supp. 2d 42, 58 n.9 (E.D.N.Y. 2012). Here, the Court finds the state court reasonably applied clearly established federal law and based its decision on a reasonable determination of the facts. Thus, under *Pinholster*, Petitioner is not entitled to an evidentiary hearing.

*Cumulative Effect*

Finally, Petitioner challenges the cumulative effect of the errors – which for these purposes include the established *Bruton* violation and the alleged *Brady* issue. "[T]he cumulative effect of a trial court's errors, even if they are harmless when considered singly, may amount to a violation

---

[8] Although the Appellate Division did not specifically address Petitioner's argument that the trial court denied him the right to present a defense by excluding certain evidence, the Appellate Division held that his "remaining contentions … are without merit." *Krivoi*, 81 A.D.3d at 980. Thus, the issue was decided on the merits. *See Holland v. Donnelly*, 324 F.3d 99, 101 n.2 (2d Cir. 2003) (per curiam) (Appellate Division's statement that "defendant's remaining contentions are without merit" is an adjudication on the merits entitled to AEDPA deference).

18

of due process requiring reversal of a conviction." *United States v. Al-Moayad*, 545 F.3d 139, 178 (2nd Cir. 2013). *See, e.g.*, *Taylor v. Kentucky*, 436 U.S. 478, 487, n.15 (1978) (finding that "the cumulative effect of the potentially damaging circumstances of this case violated the due process guarantee of fundamental fairness in the absence of an instruction as to the presumption of innocence"). Infractions that violate fundamental fairness must violate "those fundamental conceptions of justice which lie at the base of our civil and political institutions, and which define the community's sense of fair play and decency." *Dowling v. United States*, 493 U.S. 342, 352-53 (1990).

Like other claims, a cumulative error claim must be exhausted in state court before seeking habeas relief. 28 U.S.C. § 2254(b)(1)(A); *Jimenez*, 458 F.3d at 149. Here, on appeal of the denial of his motion to vacate the judgment, Petitioner asked the Appellate Division to consider the cumulative effect of the *Brady* and *Bruton* claims. DE 13-3 at 43-44. Hence, Petitioner has exhausted the cumulative effect of these claims.

It is difficult to evaluate the cumulative effects of these errors. However, several pieces of powerfully incriminating evidence – in particular, Petitioner's recorded admissions and the testimony of an independent, non-cooperating witness who observed Petitioner drive away with Roitman on the night of the latter's homicide – are entirely independent of the *Brady* and *Bruton* issues. In other words, even had the State advised Petitioner of the exculpatory statements made by his ex-wife and the trial court properly excluded the codefendant's statements from consideration, the Petitioner's self-incriminating statements and the eyewitness testimony would remain unaffected. Thus, the combined effect of the *Bruton* violation and alleged *Brady* errors are rendered harmless by the strength of the remaining evidence. Thus, the Petitioner's cumulative error challenge is denied.

### III. CONCLUSION

Because the Court has considered all of Petitioner's arguments and found them, on balance, meritless, the petition is DENIED. At the same time, a certificate of appealability shall issue as the Petitioner has raised a substantial showing of the denial of a constitutional right – specifically, the adjudged *Bruton* violation and, potentially, the alleged *Brady* violation – as well as the combination of those issues and procedural irregularities attendant thereto (such as the trial court's quashing of the subpoena without making a record and excluding the defense), even though those denials may well have been harmless error. *See* 28 U.S.C. § 2253(c)(2). Here, the Court finds "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)).

As to all grounds other than those related to the *Bruton* and alleged *Brady* issues, a certificate of appealability shall not issue because Petitioner has not made a substantial showing that he was denied any constitutional rights. *See* 28 U.S.C. § 2253(c)(2).

**SO ORDERED.**

Dated: November 19, 2021
       Central Islip, New York

                                                 /s/Gary R. Brown
                                               HON. GARY R. BROWN
                                               UNITED STATES DISTRICT JUDGE